Susan M. KALLAS, Individually and as Mother and Guardian of Timothy Brian Kallas, a Minor, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. S87–0738(LLM).

United States District Court, S.D. Mississippi.

March 25, 1991.

Tim C. Holleman, Boyce Holleman, P.A., Gulfport, Miss., for plaintiff.

Stephen R. Graben, Asst. U.S. Atty., Biloxi, Miss., for defendant.

## OPINION

MITCHELL, Senior District Judge.

Plaintiff Susan M. Kallas, natural mother and guardian of Tim Kallas, filed a claim against the United States government under the Federal Tort Claim Act, 28 U.S.C. Sec. 2671–2680 and Sec. 1346(b). Tim was injured when he ignited the contents of some munitions he had taken from an Air National Guard facility in Gulfport, Mississippi, and the contents flared up, causing an injury to his left eye. Plaintiff claims that the defendant, United States of America, was negligent and that its negligence proximately caused the injuries and damages suffered by her and her minor son. The United States leased an area at the Gulfport–Biloxi Regional Airport in Gulfport, Mississippi for training of Air National Guard units from around the country.

### Findings of Fact

1. Tim Kallas was born on December 9, 1970, and at the time he injured his eye on May 13, 1985, he was fourteen and one-half years old.

2. On January 1, 1985, Tim and another friend, Curtis Pruitt, were walking in the area of Tim's neighborhood when they saw two other youths they knew, Blaine Bellard and Christopher Tare Shiyou. Bellard and Shiyou were playing in the front yard of Bellard's home with a B–B gun. Tim noticed that Bellard was using a different type of pellet than Tim was familiar with and asked Bellard about them. Bellard then took them to a shed in his yard and showed them several boxes of "silver things", which we now know were impulse cartridges. Impulse cartridges are a type of munitions used in flight to dislodge bombs from the racks of high speed military aircraft.

3. The impulse cartridges were approximately one inch high and one inch in diameter, and according to one of the boys, resembled shotgun shells. The contents of the cartridges consisted of some pellets and powder. Bellard had taken some of the pellets from the impulse cartridges and was using them in his B–B gun. He showed the boys how to remove the contents of the cartridges, and offered to take them on the following day to the place from which he had obtained the cartridges.

4. The next day, Bellard took the boys to a wooded area which began at the end of a dead end street in the neighborhood in which Kallas and Bellard resided. It was roughly 400 yards from the house where Tim lived to the end of the dead end street. The boys followed Bellard along a trail through some woods, which led to a fence approximately six feet high with three strands of barbed wire on top. It was another 400 yards from the end of the dead end road to this fence, which surrounded the Gulfport–Biloxi Regional Airport in Gulfport, Mississippi.

5. "No Trespassing" signs were posted along this airport perimeter fence every 150–200 feet. At one spot along the bottom of the fence was a hole large enough for the boys to slip through.

6. After making their way through the opening, the boys proceeded on for at least 300 more yards before they reached another fence. This fence was eight feet high and was also topped with three strands of barbed wire. It had signs posted every 300 feet warning that the area was a controlled area.

7. At the spot where a large drainage pipe ran into the fence, some of the earth around the pipe had eroded away, leaving an opening under the fence. One of the warning signs was posted approximately ten feet from the opening. On this occa-

sion, the boys slipped under this second fence and entered the restricted area. At least two of the boys either did not recall or denied seeing any strands of barbed wire blocking the hole on this occasion.

8. Inside the fenced area were several buildings, including a shed with one wall and three open sides (see Exhibit P–4b). It was later learned that this shed was called a "build-up shed", and was used by national guard units to assemble various pieces of equipment and munitions for use in training exercises.

9. National guard units from around the country came and used the training facility for military exercises. Sometimes impulse cartridges were provided to these units from the locked storage buildings on the facility, which were protected by intrusion detection devices. At other times, the various units would bring and use their own impulse cartridges during training exercises.

10. On this occasion, there were boxes containing some impulse cartridges that had been left under the build-up shed. The boys each took some of the cartridges from the boxes, and followed Bellard back under the second fence to an area that he referred to as the firing range. They then left the area in the same manner that they had entered it, going back through the hole under the first fence.

11. Kallas took the impulse cartridges he had obtained from the training facility to his home. On a few occasions, after cutting open the top of the cartridges and removing the pellets, he would line the pellets up in rows, light them with a magnifying glass, and watch them burn.

12. In the latter part of January, 1985, Kallas and Pruitt tried to return to the training area in the same manner that Bellard had shown them on January 2, 1985. When they observed a pick-up truck travelling along the roadway within the restricted area, they did not go under the second fence, but went behind the firing range to play, as they did not want to be caught on the training facility and made to leave. On that occasion, they never did proceed under the second fence and on to the area of the build-up shed.

13. On or about May 10, 1985, Kallas went back to the national guard training facility with another fourteen year old boy named Chris Russell. This time, they proceeded all the way to the build-up shed where they found more containers of impulse cartridges. Although there was conflicting testimony about this between plaintiff's and defendant's witnesses at trial, we find that on this occasion, there were three strands of barbed wire blocking the hole under the second fence. The boys either removed or pushed aside two of the strands in order to climb through. They removed the cartridges from the premises and took them to Kallas' house. The two boys then opened a few of the impulse cartridges with a knife and removed the contents.

14. A few days later, on May 13, 1985, Kallas and Russell opened additional cartridges and emptied the contents on top of an ant hill in Kallas' yard for the purpose of blowing up an ant hill. After igniting the contents of three or four cartridges and destroying one ant hill in the process, Kallas repeated the experiment, emptying the contents of seven or eight cartridges onto another ant hill. When he lit the contents this time, they flared up suddenly, with some of the contents striking Kallas in the left eye. Kallas lost total vision in that eye. There is no prospect that he will regain it.

15. Although the boys denied at trial that they were aware they were trespassing, and denied that they knew they were on property belonging to the Air National Guard, we find that the boys did know they were trespassing when they first gained access through the airport perimeter fence. We also find that they knew they were on some type of restricted property belonging to the United States military at the time that they breached the second fence. Standard warning signs were posted at the proper intervals, in accordance with the pertinent Air Force regulations. See AFR 125–37. The signs warned that the area was controlled, and that it was unlawful to enter the area without permission. The

boys admitted that they had no permission. They clearly knew they were not supposed to be on the grounds, as evidenced by their staying out of sight on one occasion when they saw the pick-up truck driving along a road within the restricted area.

16. Kallas impressed the Court as an intelligent fourteen year old boy. According to his mother, he had an interest in sciences and experimentation. He told a number of people right after the accident occurred that he was attempting to "blow up" an ant hill. We find his judgment was such that he was capable of understanding the dangers involved in breaking open the impulse cartridges and igniting the contents.

17. Prior to May 13, 1985, the personnel at the training site were unaware that Kallas and other youths had obtained access to the training facility and its ammunition storage area. There were no reports of children playing on the training facility itself. In fact, the children took pains to stay out of sight of any personnel they saw on the premises. There is evidence that on a couple of occasions, Air National Guard personnel spotted a child inside the first fence on property belonging to the Gulfport–Biloxi airport. They reported these incidents to the proper airport authorities. Although there was some hearsay evidence that Blaine Bellard had been caught on the property, it was never clear who caught him, or whether he was on airport or Air National Guard property. Also, it was clear that he was either escorted off or directed to leave the property, and was not given the impression that it was alright to come onto or remain on property belonging either to the airport or to the Air National Guard. We do not find that this unreliable hearsay evidence proves by a preponderance of the evidence that personnel at the training site were aware of previous encroachments by youths onto the restricted property.

18. We find the impulse cartridges were not "explosives" within the ordinary meaning of the word. Defendant presented the testimony of Paul D. Price, an expert in explosives safety. He stated that, from an explosives safety standpoint, impulse cartridges are not considered inherently dangerous, and that in their normal configuration and composition they do not present a risk of explosion. Price contended that Kallas had to have placed the contents of the impulse cartridge into a metal container of some sort in order for them to explode upon ignition. Although one of the doctors that examined Kallas at the hospital reported that there appeared to be metal fragments in Kallas' left eye, we find that the fragments found were actually pieces of the pellets forming part of the impulse cartridges. We find no evidence that Kallas put the contents of the cartridges into a metal container of some sort before igniting it. However, he did combine the contents of at least seven or eight of them on top of the second ant hill before lighting them. Although the cartridges were not in and of themselves explosive, the cartridges were materially altered when they were broken open and mixed together. The ignition of the combined contents did produce an explosive effect.

19. The impulse cartridges were classified as sensitive rather than high risk munitions, according to applicable Air Force regulations. Under these regulations, open storage of sensitive munitions within on-base fenced nonnuclear munitions storage areas was permissible. See AFR 125–37, Ch. 8–4f. Major Art Nelson testified that Air Force regulation (AFR) 125–37 established Air Force standards for securing and otherwise protecting military munitions such as impulse cartridges. This regulation authorized the storage of impulse cartridges in open areas such as the build-up shed, provided the area was fenced and visually checked every four hours. AFR 125–37, Table 8–1. The specifications for fencing and the display of warning signs were also set out in this regulation. AFR 125–37, Ch. 4. All such specifications were complied with by the training site personnel in the storage of impulse cartridges. Major Nelson also stated that the training site security checks were done every two hours rather than the four hour checks provided for in the regulation. He further said that, from a security standpoint, the

storage of impulse cartridges in the build-up shed was appropriate and in full compliance with AFR 125–37. We find from our own review of the regulation that this is a correct assessment of the requirements set forth therein.

### Conclusions of Law

1. The Federal Tort Claims Act, under which plaintiff is bringing her claim, provides in pertinent part:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances,....

This provision was intended to compensate victims of negligence in the conduct of governmental activities in circumstances in which a private person would be liable. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

2. Under the provisions of 28 U.S.C. Section 1346(b), the United States District Court:

> ... shall have exclusive jurisdiction of civil actions on claims against the United States, ... for personal injury ... by the negligent or wrongful act or omission of any employee ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

In the present action, the law of the state of Mississippi determines the liability of the United States under the Federal Tort Claims Act.[1] *Williams v. United States*, 352 F.2d 477 (CA–5, 1965). *United States v. Bernhardt*, 244 F.2d 154 (CA–5, 1957).

3. Ordinarily, the owner or occupant of land or premises owes no duty to a trespasser entering the premises except to refrain from willful or wanton injury. *Coleman v. Associated Pipeline Contractors, Inc.*, 444 F.2d 737, 739 (CA–5, 1971). We have previously found that Kallas was tres-

passing. He knew he was on the property illegally. Plaintiff does not assert that the government's conduct amounted to willful or wanton behavior. Rather, plaintiff maintains that the presence of the impulse cartridges constituted an attractive nuisance, and for that reason, the government had a duty to exercise at least reasonable care, not merely to refrain from willful or wanton conduct. Plaintiff further asserts that under the particular circumstances of this case, the government had a duty not only to use reasonable care, but to use utmost care, because the impulse cartridges were explosives. This latter argument will be addressed first.

4. Under Mississippi law, a person having possession and control of dangerous explosives has the highest degree of care, so that the utmost caution must be used to the end that harm may not come to others coming in contact with them. *McTighe, Hughey, & McTighe v. Johnson*, 75 So. 600 (Miss.1917); *Hamblin v. Gano*, 76 So. 633 (Miss.1918). Section 45–13–107 of the Mississippi Code of 1972 codified this duty. It provides in pertinent part that any person who has dynamite caps, nitroglycerine caps, fuses, detonators, or other similar explosives in his possession and being engaged in a lawful business which ordinarily requires the use thereof, shall keep said articles under his control and secure from theft or pilferage at all times.

5. We have already found that the impulse cartridges were not explosive devices. Seven or eight of the impulse cartridges were broken open and dumped onto an ant hill. When the combined contents of these devices were ignited, the ignition did produce an explosive effect. But that does not render the unaltered impulse cartridges themselves explosive devices. We do not think it appropriate to hold the United States to the highest standard of care with regard to these cartridges. Rather,

---

1. Although defendant urged at trial that Mississippi law was preempted by the Air Force regulations, it did not reurge this position in its post-trial memorandum, although it was requested by the Court to do so. We assume that defendant decided not to pursue this argument.

Regardless, we find the reasoning in *Stewart v. United States*, 186 F.2d 627 (CA 7, 1951), persuasive, and find that the law of Mississippi should be used to determine defendant's liability.

the defendant should be measured according to a reasonable standard of care, if the attractive nuisance doctrine does apply, and to a standard requiring defendant merely to refrain from willful or wanton activity, if the attractive nuisance doctrine does not apply.

6. We note first that it has been the inclination of Mississippi courts to compress rather than expand the attractive nuisance doctrine's sphere of applicability. *Coleman v. Associated Pipeline Contractors, Inc.*, 444 F.2d 737 (CA–5, 1971). Some cases have analyzed the doctrine by the criteria set forth in the Restatement of Torts 2d, Sec. 339, dealing with "artificial conditions highly dangerous to trespassing children" which provides:

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

7. Assuming arguendo that the presence of the impulse cartridges under the build-up shed constituted an "artificial condition highly dangerous to trespassing children", we find no evidence that condition (a) was satisfied. Aside from some unreliable hearsay evidence that Blaine Bellard was seen at one point on either Air National Guard or airport property, there is no reliable evidence that the training facility personnel knew or had reason to know that children were likely to trespass upon the training facility. The Air National Guard had no duty to patrol or inspect the airport perimeter fence, as it was outside their jurisdiction. On the two occasions that youths were seen on the adjoining airport property, it was reported to the appropriate airport authorities. Inspections of the fence surrounding the training facility were conducted in accordance with Air Force regulations. According to the testimony of Master Sergeant Ivey Rawson, Chief of Security at the facility since 1981, they were aware of the culvert under the fence. At the time that he conducted his own semi-annual inspection of the fence sometime in January of 1985, the opening was blocked with three strands of barbed wire. Sergeant Hariel, one of the national guardsmen assigned to the training facility, testified that he inspected the fence on a weekly basis. He inspected it four or five days before May 13, 1985, and found it to be secured with three strands of barbed wire stretched across the opening and supported by a vertical metal post. Prior to May 13, 1985, he had never found any evidence of intrusions under the fence in the area of the drainage pipe. On May 13, 1985, Sergeant Rawson inspected the fence after the incident was reported to him and found that two of the strands had been removed. (It was not clear from his testimony whether the strands were actually missing or had been pulled back.) He assumed the barbed wire had been removed by the boys when they entered the restricted area. We have already concluded that Tim and his friend removed the two strands of barbed wire on their May 10, 1985 visit to the site.

8. We likewise find that conditions (b), (c) and (e) are not satisfied. With regard to (b), the presence of the impulse cartridges under the build-up shed did not alone create an unreasonable risk of harm to the youths. What created an unreasonable risk of harm was the actions by Kallas and

Russell in combining the contents of several of the cartridges and igniting these contents. In short, the boys intervening, negligent behavior created the unreasonable risk of harm, and it was not the type of behavior that could reasonably have been foreseen by the air national guard personnel. It also cannot be said that the boys did not realize the risk involved in intermeddling with the impulse cartridges, as required by condition (c). They had previously watched Bellard ignite the pellets, and had seen them flare up. They were aware that Bellard had used the pellets as ammunition in his B–B gun. Kallas had a B–B gun, and was therefore familiar with the propellent tendencies of this type of material. On the day the accident occurred, they had already combined the contents of a few of the cartridges on top of one ant hill and "devastated" it. When they proceeded to dump at least twice the amount of the contents of the cartridges onto another ant hill, they had to realize the risk of combining that much powder and pellets and igniting them. Lastly, we find that condition (e) was not satisfied. We find that the ammunition storage area was maintained, fenced, posted, patrolled, inspected and otherwise secured in a reasonable and appropriate manner. We do not find that the defendant failed to use reasonable care in the protection of children under the particular facts of this case.

9. The attractive nuisance doctrine has also been analyzed without reference to Section 339 of the Restatement of Torts 2d. Under this analysis, the following must be found:

a) that one has maintained a dangerous instrumentality on his premises easily accessible to children and of a character likely to attract them in play, or, that one permits dangerous conditions to remain on his premises with the knowledge that children are in the habit of resorting thereto for amusement, and

b) who fails to exercise ordinary care to prevent children from playing therewith or resorting thereto, is liable to a child non sui juris who is injured thereby, and

c) which child did not know or appreciate the danger incurred by him in playing with the instrumentality. *Hamblin v. Gano*, supra.

10. In other words, in order for the attractive nuisance doctrine to apply, first the instrumentality complained of must be inherently dangerous. As stated earlier, we do not find that the impulse cartridges were inherently dangerous. See *Jackson v. City of Biloxi*, 272 So.2d 654, 658 (Miss. 1973).

11. Even if we assume arguendo that the impulse cartridges did constitute a dangerous instrumentality, we do not find that the other required elements of the attractive nuisance doctrine have been satisfied. Although the boys did gain access to the property by climbing through two fences and removing two strands of barbed wire, we are not prepared to call this "easy access." Also, although these impulse cartridges, like almost any type of ammunition, could be said to be "of a character likely to attract [children] in play," we cannot say that the defendant failed to exercise ordinary care to prevent children from playing with or resorting to the munitions. First, defendant had no knowledge that the boys were in the habit of coming onto the training facility. They had no knowledge that the boys were removing impulse cartridges from the facility and taking them home to play with. Plaintiff argues that the defendant should have known through proper inventory controls that some of the impulse cartridges were missing. The defendants did conduct inventory every six months, in accordance with the applicable regulations. Their inventory did not reveal that any cartridges were missing. It seems more than likely that the cartridges were brought onto the grounds by a visiting national guard unit. The government, of course, is still responsible for any negligence by a visiting unit. But the Air Force regulations authorized open storage of these types of munitions, and we have previously concluded that open storage of these types of munitions was reasonable. We therefore must conclude that the government exercised ordinary care in pre-

venting access to the area where the munitions were stored.

12. Lastly, the third element of the attractive nuisance doctrine has not been met. As discussed above, we find the boys did know and appreciate the danger incurred in playing with the impulse cartridges in the manner in which they did. We are not at all oblivious to the tendency of boys this age to experiment with this type of instrumentality. And if these boys had been at an age where they could not fully appreciate the dangers involved, we would likely have reached a different result. But the boys chose to proceed with their activities in spite of the dangers that were known and obvious to them. While we sympathize deeply with Tim, we find in this case we must adhere to the admonition we normally give in jury cases. We must not let our sympathy for Tim interfere with our judgment in applying the law.

13. "We take it to be fundamental that each case of this type rests on its own facts and circumstances." *U.S. v. Bernhardt*, 244 F.2d 154, 156 (CA–5, 1957). After a careful examination of the case law in this area, we have concluded that the facts of this case do not justify a finding of liability on the part of the government. Plaintiff relies heavily on the holding in *Stewart v. United States*, 186 F.2d 627 (CA–7, 1951). But in *Stewart* there was no question that the instrumentality involved, a hand grenade, was an explosive device. *Id.* at 631. In addition, the military reservation in *Stewart* was open to the public, and the grenades were in a box plainly marked "Fireworks", which boxes were in plain sight from the area which was open to the public. In fact, in *Stewart*, the public had the implied and possibly the express consent of the government to be on the military reservation in the first place. Such was not true in the instant case.

14. All of the cases relied upon by plaintiff can be distinguished, either on the ground that a dangerous instrumentality was involved, or on the ground that the youths involved were not capable of realizing the dangers involved.

In conclusion, we find that as a matter of law, the plaintiff has failed to meet her burden of proof in attempting to establish a case of negligence against the United States. In the event that any of the above and foregoing findings of fact constitute mixed findings of fact and conclusions of law, those findings of fact are adopted and incorporated herein as conclusions of law.